All right, whenever you're ready. Thank you, Your Honor. Good morning. May it please the Court. I am Joseph Biancolli representing the petitioner, the Putnam Center, which is a skilled nursing facility in Hurricane West Virginia. Your Honor, this is an important case not only for the hurricane. It is hurricane. I was looking to see where you're from. I'm from Northern Virginia. I see that. It's hurricane. Well, there we go. My wife can make fun of me now. Your Honor, this is an important case not only to the parties but also to the nursing home profession because of the way the issues have been framed in this case. And we think there's four reasons why the Secretary's approach to this case has confused and not clarified the legal issue before you. That issue is whether CMS somehow can extrapolate or infer authority to regulate physician practice from the nursing home regulations. Those regulations, statute under which they were promulgated, do not include such authority. And then there's a secondary issue, which is whether CMS then can use what other courts have called third-level interpretations of interpretations to impute liability to the Center, again, where no regulation expressly provides for such authority. So as we discussed, CMS has never really explained the mechanism by which the Center staff somehow could have intervened to step in to substitute for Dr. Skaggs to get the resident issue here, oral surgery, under general anesthesia. And we have had a hard time, and our physicians, frankly, have had a hard time, even articulating how the nurses at the facility could have done that. So the four reasons why we think that the case needs to be reversed are, first, keep in mind when considering the Secretary's arguments that, at least with respect to the issues in this case, Dr. Skaggs was the resident's personal physician. He was not an employee of the Center. He was not in control of the Center. CMS never disagreed that the Center staff had no authority to disregard, counterman, or even to question his clinical orders. And CMS has never said where it finds the authority to address his orders at all, much less to the Center for his orders. Dr. Skaggs did order that he could have the extraction surgery. Right, with the limitation of anesthesia, correct, under local or twilight anesthesia. So the impasse, and we've addressed this in the briefs. The point of that, to make sure I understand, is that nobody would do it under those circumstances. There was only one surgeon available locally, and he wouldn't do it under those circumstances. So in essence, the authorization to do it under twilight was a prohibition on doing it as an effective matter. Well, it led to the impasse, and as even CMS's experts said, that does happen from time to time, and if the physician and the surgeon cannot agree, then the surgery doesn't happen. And that's the way it happens. CMS says the facility had some obligation under the regulation, not only to address, but somehow to resolve that impasse. And we say that's an interpretation of the regulation that is not reasonable under Chevron or anything else. Help me understand this. One of the challenges, which is a little taking you off point, but the regulators show up after the fact, writes this letter that ALJ gives credence to, and he says from February to July, maybe he says June, but I think he means July, surgery could not have taken place because the resident, and I know we're all using his name, but I'll just call him resident for the record's purposes, that the resident couldn't withstand surgery, but for that time frame. So in October, he makes the decision to write, not that he wasn't able to do it from February to October, but he's not able to do it from February to July, and the ALJ says, I give that credence. I don't give him sort of later after the fact claim that he also couldn't do it in August and September, I don't give that credence in part because he had the opportunity to write that the first time and chose not to. So help me understand that question, why we shouldn't defer to the ALJ, we've had lots of discussions about deference to fact finders today in a variety of different contexts, but that to me seems like a pure credibility determination where the ALJ says, listen, I agree, Dr. Skaggs, I totally am on board with him, but I'm only on board with what he says. When he sort of gets out over his skis here talking about the very end, I can't give him any credibility there. The important point is that the ALJ shouldn't have gone there at all. This case is different than the two others you just had, because here we're saying the regulation doesn't even reach that issue. Leave aside whether Skaggs had a discussion with the surveyors and an argument, leave aside Skaggs testimony at the hearing and so forth, we're saying that was all well beyond the authority of CMS to regulate or for the ALJ even to look at. Once Skaggs gives his order, and then once the consequences of that order play out over time, none of that had anything to do with the obligations of the facility under the regulation under which you cited them. So in a hypothetical scenario where the resident is hospitalized and so Skaggs says you can't get the surgery, two years passes, the guy is now up running marathons and participating in Ironman, the center doesn't have any obligation at all to go back to his doctor or go anywhere to say, you said before he couldn't do it, but now he demonstrates extraordinary health. We have no obligation and the law does not permit any obligation to go back to the doctor and ask, is he well enough now? No, we're not saying that. We've come up with, with all due respect, all kinds of hypotheticals under which a nurse within her scope of practice can say, wait a minute, there's something wrong here. In fact, one of the cases, one of the administrative cases that we talk about is similar to the hypothetical that you pose. In that case, the board said, where a nurse within the scope of her practice can tell that there's something wrong and that the physician should have at least addressed an issue. That's something within the center's obligation, that is in terms of the center's care. I think the specific case was a resident who continued to itch, itches and so forth, and the physician either disregarded it or gave orders that didn't work. At no point did a nurse go to the physician and say, doctor, these orders aren't working. That was clearly within the scope of the nurse's practice. Here, CMS has never said that it was in the scope of a nurse's practice to question whether this order for limited anesthesia still applied under the circumstances. That's well beyond the scope of practice of a nurse. It was throughout the entire period. That's why we say the parsing of the time doesn't really address that issue at all. It's still not within the scope of the nurse's practice to do that questioning, whether it was in June, July, October, or at any time. The nature of the underlying question was beyond the requirements of the regulation for this facility. I'm understanding. That's because the nature of anesthesia is too complicated for nurses where itching, they can sort of understand? Is that a simplified way of what you're saying? Exactly. Because beyond anesthesia, the suitability of this resident for surgery at all, the relative seriousness of his conditions, where Skaggs is going, I think his breathing is more serious than his teeth. Again, beyond the scope of a nurse to make that judgment. We say in terms of the regulation, we're in terms of the highest practicable status, it turns out within the scope of the nursing care plan, the determination of highest practical status by definition is made by a physician and not a nurse. The regulation, the terms of the regulation itself... How do we draw that line? Where would I go to find that line? Itchy, nurse can handle, surgery, not nurse. How do I find that line of what a nurse is qualified to do or not do? Wherever the line exists, and there is a difference between scope of practice of a physician and scope of practice of a nurse. You could look in the state nursing statutes, the scope of practice statutes, wherever. Wherever that line is, the board has said in other cases, there is no obligation under this regulation for a nurse to second guess, question, etc., physician judgments that are within the scope of practice of the physician. Your argument is that includes over time. I get day one, doctor says, can't do it, nurse can't second guess that decision. But a year passes, circumstances have changed, breathing is better, whatever it is, hypothetically. The nurse doesn't, is outside their scope to even say, you need to take another look at this patient, doctor, because they've gotten much better. Well, let me put it in terms that Judge Traxler was talking about in one of the previous cases, and that is, do you want to put it to an ALJ to start running hearings about nursing home practice as if it's a personal injury case, or as if it's a physician discipline case? You know, where you start questioning where, you know, or start parsing where to start questioning the judgment of the physician, and where to start saying that the nurse should have stepped in. I think the board has said, and said properly, where the issue is clearly within the scope of practice of a nurse. We're going to put the obligation on the nurse and her employer in the facility to take certain steps. And the way you define what the question is, is going to answer the question. Is it a question of what's the most important thing for this resident?  Surgery? Physician. Anesthesia? Physician. That doesn't change, ever. Didn't more than one physician indicate his need for this extraction surgery over the course of time? Well, he went to the dentist in October of 2013, which is what triggered this. So far as we know, he never went back to the dentist. He then went to the oral surgeon who concurred that he needed the teeth out. And then that was, of course, in his record. So as he went to the hospital and so forth, other physicians were aware of that. The only time that we know that another physician actually directly looked at it was when he was in the hospital for the two-month period, where there's some indication in the records that the hospital was going to try to do it, but for whatever reasons, they never did. And then at the very end, at the time of the survey, after the surveyors got into the altercation with Dr. Skaggs, Dr. Skaggs deferred to his pulmonologist to write the order. But the only physician that actually made the judgment that the teeth need to come out were the dentist and then the oral surgeon. So I think at the end of the day, we're asking you to do essentially three things. One is to say that the Administrative Procedure Act should have governed this, and that is that CMS should have had the burden throughout to show how the facility staff violated the regulation. And then... And did you make that argument below, the burden argument? Absolutely. We make that in every case, given, as we said, the fact that over the last 10 years, this has become very fuzzy. It started with the request for hearing, it was in the pre-hearing brief, it was in the post-hearing briefs. We made that all the way through. All right. Secondly, that the regulations mean what they say, and that CMS doesn't have unlimited authority to extrapolate, you know, and to do these second and third level interpretations of interpretations. And then finally, to apply those two principles to find that CMS never demonstrated a prima facie case of the regulation that it actually cited as the basis for the sanctions. And I'll reserve the balance. Thank you. Thank you. Okay, Ms. Jurek? Mm-hmm. May it please the Court. My name is Suzanne Jurek. I'm a Special Assistant United States Attorney representing the Secretary of the United States Department of Health and Human Services. The Secretary also believes that this is a very important case, and that's because a nursing home neglected a resident's need for oral surgery for eight straight months, subjecting the resident to life-threatening harm. It's an interesting case because the resident himself says that he doesn't place any blame on the nursing home and that he's had these issues for a while and doesn't cause him any pain. You're correct. That's correct, Your Honor. But what's at issue here is the compliance with the Medicare requirements, and that concerns the nursing home's obligation to provide necessary services and to ensure that residents receive necessary services. So regardless of how the resident feels about it, that's what the Court is tasked with evaluating, is the nursing home's obligation here. This fine also seems, at least to me particularly, high, but I'm not in this field the way that you are. Is this an ordinary amount for this type of situation? It's commensurate with the level of harm. So there are different kind of bands for the CMP amount, and when, as is the case here, the noncompliance subjects a resident to life-threatening harm, then the band is, I believe, between $3,000 and, I can't remember the upper limit, but this daily amount was $5,100 per day, which is actually toward the lower end of the band. So because it went on for so long is how we get to that amount then? Precisely. The reason the penalty is so large is because the resident was neglected for so long. Let me ask you a threshold question, which gets a little bit to this timing issue. Is it your position that it's irrelevant whether the resident could have actually undergone surgery between February and July, because even if he could not have undergone surgery, the nursing home failed to take what you view as adequate steps to schedule that surgery? And that's the board's decision with respect to reversing the ALJ's decision, turns on the belief that the ALJ was legally incorrect in relying upon the inability of the resident to undergo surgery during that time period. Well, Your Honor, I would frame it this way. I don't think it's irrelevant that the resident's medical condition is not irrelevant, but what was clearly true in this case is that the resident's condition fluctuated up and down throughout this eight-month period. So you agree if, take a different hypothetical where a different resident was plainly incapable, and all the medical evidence was absolutely incapable of undergoing surgery, and the center, as a result of that, did nothing to try to schedule surgery, that that would be permissible. That wouldn't be a violation of the regulation. Correct, Your Honor. That would be a different case, though, because here... But here, the ALJ made the determination, the credibility determination, as I read it, that from February through July, the patient was incapable of undergoing surgery with the anesthesia that the surgeon required. Well, with all due respect, Your Honor, it wasn't a credibility determination. There are two significant things that we have to look at with respect to the ALJ's determination about the first five months after the resident had the oral surgery consult. First of all, as the board correctly noted, there was legal error. The ALJ and the board found that there was no evidence that Dr. Skaggs had made a contemporaneous medical judgment that the resident was too sick for the procedure, and because there was no actual medical judgment, what was clear is that the ALJ was attempting to determine retrospectively what the medical judgment would have been made appropriately at the time. So there's no proper basis for the ALJ... So answer me this one. So when I look, you say no evidence, right? And that's the board's determination, no evidence to support the ALJ. But I look into the record in the April scenario where the social worker shows up and she documents that the resident cannot undergo surgery because the doctor has ordered that he not, right? And so that's in April of 2014, right? That's the social worker confirms that idea in April, right? Which is the same one that the ALJ credits from Skaggs. Well, first your honor, I don't think that's the precise wording and it's not quite as clear cut as that. The social worker does make some reference to the fact that there's a delay because of the resident's medical condition. But what's very significant is that basically we're dealing with the same situation throughout the entire period of non-compliance, which is that the resident's health is fluctuating up and down and the facility was doing nothing. So it was nursing home's responsibility to- What's the best evidence you have in the record that from February through July that this resident was capable of undergoing general anesthesia and full teeth extraction? Tell me where to look. Well, first of all, what's clear during the period of June and July, two significant things, the hospital records make that very, very clear. Number one, the hospital physicians, in particular, the infectious disease specialists determined that this was a problem and all of the physicians were so concerned about making sure that this resident got this procedure timely that they were trying to figure out some way to make it happen in the hospital before they discharged. Wait, wait, wait. They're so concerned about it that they say, we don't have the equipment, so we'll do it later. That didn't seem like so concerned to me and nowhere in those records. I mean, I read through the pieces you cite, which I'm not sure actually are where you mean to cite, but when you read through the portion 2416 that you claim supports this idea, I don't think it supports the idea at all that they're making a determination that he's capable of undergoing surgery. They're agreeing he needs his teeth taken out, but they're trying to find someone who could do that, and they say, well, we could, except we don't have this equipment, and so we'll wait till we can go buy this equipment, which seems to me an indication it's no emergency, and so we'll send him home until somebody can figure out how to go buy this new equipment. Well, the fact that they weren't able to do it, I think, does not prove the point that they didn't determine it was an emergency. It only proved that they weren't able to get it determined this was necessary. It must be done. I don't think it proves that at all. I think it maybe suggests the contrary more than the former. Well, what's even more significant, Your Honor, is that the resident had a tracheostomy under general anesthesia during his period of hospitalization, so that clearly demonstrates that he was capable of undergoing a fairly comprehensive procedure. During the June and July procedure. They determined that it is so necessary because otherwise he's not going to be able to breathe that we're going to put him under, so that seems to me a different cost-benefit analysis than a decision to take out teeth, no? Well, not necessarily. According to the CMS's expert, Dr. Sheifetz, this was life-threatening, the fact that this man had this severe periodontal disease. He had bacteria rotting in his mouth for eight months, and it was causing or contributing to I want to go back to the original question. In February through July of 2014, what is the best evidence you've got is what happens in July? No, Your Honor. I was just trying to point out that the evidence is quite strong that he was capable of receiving the procedure in June and July of 2014 because he had another procedure and also because the hospital physicians there seemed to believe that he could have the procedure. But the whole first four months after the resident had the oral surgery consult, there's absolutely no evidence of a determination to the contrary. I know, but I'm asking a different question. I want you to point me to the record where there's evidence that he could. You may say that's not the right standard. I totally understand that. I'm just trying to figure out what is the best evidence I'm looking for to say that, you know, Skaggs is totally wrong. This guy could do the surgery. Well, this is the problem. We can't prove a negative because they just simply didn't address it. So since they didn't do the assessment, they didn't respond to the request from the oral surgeon consult. There is nothing there, but what's clear is that the situation is the same from February of 2014 until October of 2014, which is that the resident's health condition is going up and down. The CMS's experts said there are many, many windows when this procedure could have been performed and only, you know, these kind of minute spots of time, you know, for example, where he had, you know, acute aspiration pneumonia where he wouldn't have been able to have the procedure until that got under control. So I wanted to address opposing counsel's statement in his argument. There's no evidence whatsoever that there was any disagreement about the level of anesthesia here. It's true that in October of 2013, Dr. Skaggs authorized surgery under local or twilight sedation in response to the dentist consult. But then, you know, many months later in February of 2014, the oral surgeon performed a consult and the oral surgeon recommended the surgery and then the oral surgeon requested medical clearance. Dr. Skaggs and the nursing home just never responded to that oral surgery consult. There's no dispute regarding the level of anesthesia because it never got that far. Dr. Skaggs and the nursing home never responded to the request for medical clearance, so there can't be a dispute about how the procedure was supposed to proceed. The other point I wanted to respond to was that Dr. Skaggs was not only the resident's physician, but he was also the medical director for the nursing home. Therefore, Dr. Skaggs' actions can be imputed to the facility. There are really three critical points here. The non-compliance at issue is the nursing homes in action. As I mentioned earlier, in February of 2014, there was an oral surgery consult. The oral surgeon requested medical clearance from the nursing home, and the board and the ALJ found that the nursing home took no steps to schedule the total tooth extraction procedure until the surveyors intervened. During the entire... But you agree, if in a hypothetical, the medical evidence said from February to July, the resident was incapable of undergoing surgery, you agree that the nursing home would not have any obligation to do anything in light of that evidence? I do, Your Honor, but that's not this case. What's even more significant is that Dr. Skaggs admitted to the surveyors during the survey that he wasn't even aware that there was another request for medical clearance after he had provided that limited authorization in October of 2013. Similarly, at the hearing, Dr. Skaggs again said he wasn't aware. He thought he was done after he wrote that October 2013 authorization for the procedure. He wasn't even aware that people were trying to get this medical clearance and that they were even still trying to schedule the surgery. That's abundantly clear from the record evidence that there's just no acknowledgement whatsoever on the part of Dr. Skaggs. First of all, what the resident's oral condition is that he's awaiting this procedure and when what's supposed to happen with that. So again, the noncompliance at issue is the nursing home's inaction. The nursing home's physician, Dr. Skaggs, never made a medical determination that the resident was too sick to have the tooth extraction procedure. Prior to the resident's hospitalization... I'm sorry, just because I don't understand that second point, you just discount the October 14 letter that Dr. Skaggs wrote. You say that's not reliable. I'm sorry, there was an October 2013... No, October 2014, he writes a letter and says, from February through June, the resident was incapable of undergoing surgery. That was an after-the-fact determination and not only that, it contradicts other testimony provided by Dr. Skaggs. So one of the things that was very clear is that the ALJ determined that Dr. Skaggs was not able to have... The ALJ said specifically, I credit Dr. Skaggs for that time period, no? Well, it's very, very clear, Your Honor, that ALJ was dancing around this issue because if you look at the Joint Appendix, pages 20 and 22, and also the Joint Appendix of page 52, the ALJ and the board found there was no evidence that Dr. Skaggs had made a contemporaneous medical judgment that the resident was too sick for the procedure. And if you look at the... But the ALJ says, in spite of that, I give him credence. He... You may infer that, Your Honor, but I think that the decision speaks for itself because on page... Joint Appendix, page 20, he specifically says he does not find Dr. Skaggs' testimony credible. And then when he does make the determination that, hey, I'm going to reverse this period, I find that the facility was actually in compliance for the first five months after the oral surgery consult. You'll notice it's a one-paragraph decision that doesn't really cite to any evidence. This is at the Joint Appendix, page 33. And he doesn't mention Dr. Skaggs' testimony whatsoever. It's really just the ALJ's own retrospective interpretation. Hey, I think this guy was too sick during this time. At the very... On the one hand, you could view it that the ALJ is making his own interpretation, but you could also say that he's making it on no evidence either. But it's... There isn't a clear-cut determination by the ALJ that he was reversing CMS's determination based on an actual credibility determination about Dr. Skaggs. And furthermore, the board pointed out that when you look at the record as a whole, there's no way you could determine that the first five months was any different than the last three months. So the ALJ found with tons of evidence that the resident was not too sick to have the procedure for the last three months, yet it's really the exact same circumstances for the first five months in that the resident's health was fluctuating up and down. And there were definitely... There's CMS expert testimony to support the fact that there were multiple, multiple windows when this resident could have had this procedure and did not need to wait eight months to have it done and did not need to be subjected to life-threatening harm in the interim. And even the ALJ significantly points out, one wonders how long the resident actually would have had to wait to get the procedure had not the surveyors intervened. It was really just the resident's good luck that the nursing home happened to come up for an annual survey, that he happened to get selected in the random sample, and the surveyor interviewed him. And it's not clear when, if ever, the resident would have received this procedure had not the surveyors intervened. And that's very, very significant. So the third critical point here is that the ALJ erred in concluding that the nursing home was in compliance for the first five months after the resident had the oral surgery consult. The ALJ incorrectly concluded the resident's medical condition made surgery feasible after July 25th, 2014, but not before. And the board correctly concluded that the ALJ erred. And the reason is that there was legal error. Again, there was no evidence that Dr. Skaggs made a medical judgment that the resident was too sick to have a procedure during the initial five months  and the ALJ was clearly attempting to determine retrospectively what the medical judgment would have been made appropriately at that time. And also there was factual error in that the same facts that support the ALJ finding of inaction for the July 25th, 2014 through October 15th, 2014 period apply with equal force to the earlier time period. It's undisputed that Mountain State made a request for medical clearance on February 17th, 2014, the same day as the oral surgery consult. The board pointed out that Nurse Hodges acknowledged she knew that there was that medical request, yet there were no assessments of the resident's oral condition at all during the first five months. There's no... And your red light is on. Could you briefly conclude? Yes, Your Honors. Again, there are just three critical points here. The noncompliance at issue is the nursing home's inaction, that Dr. Skaggs never made a medical determination that the resident was too sick to have the tooth extraction procedure, and the ALJ erred in concluding that the nursing home was in compliance for the first five months after the resident had the oral surgery consult. There was both legal error and factual error. Thank you. All right. We'll have rebuttal. Very briefly, thank you, Your Honors. First of all, so far as we can tell, the fine in this case, the civil money penalty, was the largest against any nursing home in the country at the time, so far as we can tell. There's been some bigger ones more recently, but this one was the biggest. Well, opposing counsel explained that that was because it went on so long. Right, but CMS claims discretion. And in fact, it may have gone on longer if the surveyors hadn't arrived. Sure. CMS always claims the discretion to pick the starting point and the ending point, and that's how the size gets big. So our concern, our biggest concern... Well, where would you put the starting point and the ending point? Well, we don't think there was any noncompliance at all, but... Well, then they get to pick. Pardon? Then they do get to pick. Well, no, and that's why, you know, we put on evidence that we do about compliance. I mean, even if it's our burden to show compliance, and so we thought we did. And we think there's a lot of... The sort of broad language, you know, neglect and no, you know, the facility doing nothing and so on, again, disguises what we think is the legal issue that's before you. This is not a typical nursing home case. This Court has seen quite a few of them. I've argued quite a few of them myself, where a facility is trying to explain away some bad outcome or explain away why its nurses didn't follow a physician's order. In this case, the Board had to engage in some legal gymnastics. I think even counsel herself sort of characterized the ALJ as sort of dancing to get to a result. To fit its findings of noncompliance, or the CMS's findings of noncompliance, into the regulatory scheme and into the specific regulation that they cited. And it's interesting that in its briefs, CMS has never really addressed that issue. You know, even if you look at this from a Chevron perspective, right, where an agency has some leeway to interpret its regulations. Some of the Court decisions that we've cited do say that. That leeway, you know, however you read it these days and people are critiquing it these days and so forth, really sort of is cut off when you're getting to the second and third level interpretations, where CMS has never given any guidance. And there are reams and reams and reams of guidance, not one of which says a surveyor, you know, a state inspector, a nurse, has the and that we think is critical here. There is no general warrant under this statute, which is entitled Nursing Home Reform, under these regulations, which were entitled Long-Term Care, Nursing Home Requirements and Participation, for surveyors essentially to interpose their personal preferences, their personal opinions about what doctors should have done. And then you have, once the process gets going, you know, once you get an appeal and an ALJ, you wind up having, as we say in the briefs, the board sort of, you know, does what it needs to do to get to a result. And in this case, the doing what it needs to do has created a real problem for nursing required by law to go outside what she believes to be the scope of her practice and question a physician or even bring to the physician's attention. I mean, and again, it is a problem, a practical problem. When do you want nurses to be telling physicians they need to revisit their previous judgments or that the nurse may disagree with the physician's characterization of a resident's medical condition or that there's a problem, you know, with this surgeon, right? Should we, the nurses, interpose ourselves in the middle to address that problem, right? And neither the board or the ALJ addresses those issues. But those are issues that necessarily result from the way that CMS has applied this regulation in this case. Regulation talks about highest practicable status, right? And that has to be in terms of the physician's judgment. And it talks about providing care in accordance with necessary services in accordance with the nursing plan of care. That does not give nurses authority to start going off into areas like anesthesia, suitability for surgery, relative priority of medical conditions. And with due respect, that's what we think this case is about. We think virtually everything, and we raise this throughout. We raise this in our request for hearings, we raise it to the ALJ, raise it to the board throughout. That virtually everything that the ALJ and the board addressed really goes beyond the scope of this regulation and causes nursing facilities great problems to the extent that it confuses the relationship between nurses and physicians. And that's why we think you should apply the regulation the way it's written, with the conditions that are written in the plain language of the regulation, not give CMS a warrant to put interpretations of interpretations on the regulation. Thank you. Thank you. All right, we'll come down and greet counsel and ask the clerk to adjourn court until tomorrow morning at 9 a.m. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Stephanie D. Thacker, Julius N. Richardson, William B. Traxler Jr.